## THE ULLOCK.

### (District Court, D. Oregon. February 7, 1884.)

1. OFFER OF PILOT SERVICE BY SIGNAL.

The pilot commissioners of Oregon, under the pilot act of 1882, are authorized and required to declare by rule what shall constitute a valid offer of pilot service on the Columbia river bar pilot grounds, by a signal addressed to the eye, and in so doing may prescribe the distance within which such signal must be made from the vessel signaled.

2. SIGNAL FOR AN OFFER OF PILOT SERVICE.

The statute of the United States does not prescribe any signal to be used on a pilot boat in making an offer of pilot service; and the light required by section 4233 of the Revised Statutes, to be carried by a sailing pilot vessel at night, is only used to prevent collision and incidentally to give notice of the character of such craft; but the usual signal by which an offer of pilot service is made, is the jack set at the main truck in the day-time, and "flare-ups" at night, and this jack is usually the ensign of the country in which the service is offered. In the United States it is a blue flag charged with a star for every state then in the Union, and called the "Union Jack."

3. THE TERM "STATE" CONSTRUED TO INCLUDE A "TERRITORY."

The term "state" in the act of March 2, 1837, (5 St. 153; section 4236, Rev. St.,) regulating the taking of pilots on a water forming the boundary between two states, construed to include an organized "territory" of the United States.

In Admiralty.

*Frederick R. Strong,* for libelant.

*Erasmus D. Shattuck* and *Robert L. McKee,* for claimant.

DEADY, J. The libelant, George W. Wood, of the pilot schooner J. C. Cozzens, brings this suit to enforce a claim for pilotage against the British bark Ullock of $76, growing out of an offer to pilot said bark in and over the Columbia river bar on March 24, 1883, and a refusal to receive the same by the master and claimant, Alexander Swietoslawski. It appears that the alleged offer was made between 4 and 5 o'clock in the afternoon, at a distance of some 25 miles from the bar, and consisted in the schooner's setting her jack at the main truck until dark, when she set her mast headlight and burned "flare-ups" over the side. The bark was approaching the bar from the south-west. The schooner, which was lying to, north-west of the bar, on observing her, ran down before the wind across the course of the bark. The bark paid no attention to the schooner, but kept on her course about E. N. E., until half-past 7 o'clock, when she had the Cape Hancock light on her port bow, and was hailed by the steam-

tug Brenham and took therefrom a pilot. The schooner, in her run down the coast, passed astern of the bark, and then jibed sails and followed her. Between 9 and 10 o'clock the bark tacked and stood off shore, and soon after met the schooner with the libelant on board, who offered his services as pilot, which were declined by the pilot on board, the master being below.

In the testimony of the crews of the bark and schooner there is the usual amount of flat contradiction concerning the disputed circumstances of the case. The libelant swears that when the fog lifted and he first sighted the bark she was in plain sight, and not more than two or three miles distant, when he put the schooner before the wind and made sail to cut her off, and that when he came within a mile of her he expected the bark to lie to until he could go aboard, but that she kept on her course, and the schooner had to jibe her sails to follow, whereby the latter fell astern, and that thereafter he kept within from one to three-quarters of a mile of the bark until they met. The master of the bark swears that when he first sighted the schooner she was seven or eight miles away, and when night set in she was still four or five miles distant, and he did not see her afterwards until they met as above stated. But the master admits that he saw the schooner, and that he knew she was a pilot-boat from the flag at her mainmast, and that he did not lie to or signal for a pilot because he did not know certainly how far he was from the bar, and he did not want to take a pilot so far out as to incur the payment of "distance" or "off-shore" pilotage.

It is admitted that the master of the Ullock had been in the river four times; that the Cozzens is the only pilot-schooner that had been on the bar for about two years before this time; and that she put a pilot on the Ullock under the same master in 1882; that the libelant was a duly-qualified bar-pilot under the laws of Oregon; and that the pilot from the tug who brought in the bark was a duly-qualified one under the laws of Washington territory.

By section 30 of the Oregon "pilot act of 1882" (Sess. Laws 20) it is provided that "the pilot who first speaks a vessel * * * or duly offers his services thereto, as a pilot, on or without the bar pilot ground, is entitled to pilot such vessel over the same;" but the master may decline the offer, in which case he shall pay, if inward-bound, full pilotage. And section 34 provides that the pilot commissioners "must declare by rule what constitues a speaking of a vessel or an offer of pilot service on the bar pilot grounds," within the meaning of the act.

By rule 9, adopted by the commissioners in pursuance of this authority, on November 17, 1882, it is provided that "the term, 'speaking a vessel for pilot service,' shall be construed to mean either by the usual form of hailing, or, if out of hailing distance, and within one-half mile, then the usual code of signal shall be made use of." This rule preserves the distinction that is made in the pilot act be-

tween "speaking" or "hailing" a vessel and a mere "offer" of pilot service. The former implies that the parties are within speaking distance, and can only be done by word of mouth, supplemented, it may be, by some such device for projecting the sound of the voice as a speaking trumpet, or even personal gesticulation. *Com.* v. *Ricketson*, 5 Metc. 412; 2 Pars. Shipp. & Adm. 109. But an "offer" of pilot service may also be made by some arbitrary but established sign or demonstration, made from beyond ear-shot and addressed exclusively to the eye. And this offer, according to the rule, must be made with "the usual code of signal," whatever that is.

It is unfortunate that the commissioners did not declare definitely what signal constitutes an offer of pilotage, as required by the act. Declaring that the offer should be made by "the usual code of signal" has thrown no light on the subject, and may be darkened it. The expert witnesses, including one of the commissioners, do not seem to be very clear as to what this "usual code of signal" is; though the apparent confusion in their testimony may arise from the want of knowledge on the part of counsel who examined them. For instance, the commissioner having testified that an offer of service was customarily made by the pilot-boat putting her "head down toward the ship and showing her blue flag," her number being on her mainsail, "and at night by burning a flare," counsel for the libelant said: "Then I understand you to mean the use of the usual signals prescribed by the Revised Statutes of the United States to be used on board pilot-boats?" to which the witness answered, "Yes." Now, there are no signals prescribed by the statutes of the United States for the use of pilot-boats in making an offer of pilot services, nor had the witness in any way indicated that that was what he meant when he said that the pilot-boat must "show her blue flag." The question was based upon an erroneous assumption, both as to the statute and the previous statement of the witness, while the answer was apparently made upon a total misapprehension of both.

The rule assumes that there is a usual and well-understood signal by which a pilot-boat can make an offer of pilot service to a vessel not within hailing distance and be understood. But whether that signal is known throughout the civilized world, or whether its use is confined to this coast, or even this port, does not clearly appear from the evidence, or at all from the rule. But this is a subject concerning which I think the court may supplement the evidence by its judicial knowledge. And, first, the use of the word "code" in the rules is misleading. I think there is no "code" of pilot signals; although there may be, and doubtless is, a signal for "a pilot wanted" in the international code of signals, or that of any country. The usual signal by which an offer of pilot service is made in the day-time is a flag at the masthead. This, of course, will be the flag of the country in which the offer is made, or that modification or portion of it called the "Jack." In the United States it is a blue flag charged.

with a star for every state in the Union, and called the "Union Jack."

By section 4233, subd. 11, Rev. St., a sailing pilot-vessel is required to carry a white light at her mast-head during the night, and "exhibit a flare-up light every fifteen minutes." But neither of these lights, thus required to be carried, are signals that indicate an offer of pilot service, for they must be carried although all the pilots on the boat have been distributed. Evidently the statute requires these lights to be burned for the purpose of making known the whereabouts and character of the boat in order to prevent collision, and incidentally to advise any one in need of or desiring the service of a pilot where to apply. But the burning of "flare-ups," or a flashing light, over the side of the boat, at short intervals, is also the customary method of making an offer of pilot service at night. It follows that the libelant made a proper tender of his service as a pilot to the Ullock, both in the day-time and after night, provided he did so within the distance prescribed by the ninth pilot rule. Without saying so directly, the neccessary effect of this rule seems to be to require that an offer of pilot service made otherwise than by hailing, as by signal, shall be made within a half-mile of the vessel signaled.

Counsel for the libelant contends, however, that the power of the commissioners does not extend to prescribing the distance within which such offer must be made. But in my judgment it does; and for manifest reasons. They are expressly authorized and required to declare what shall constitute a valid offer of pilot service; and when this may be done by a signal, as by setting a blue flag at the main-truck, the distance at which the pilot-boat is from the vessel signaled is a material element in the transaction. And, *first*, it ought not to be so far away as to leave any room for dispute as to whether the signal was made or seen; and, *second*, a vessel ought not to be compelled to wait for a pilot from a boat that signals her a great way off, when, in all probability, she can get one much sooner and nearer in shore if she is allowed to proceed on her way. And what distance is suitable and convenient for both the party making and receiving the signal is a matter committed by the pilot act to the judgment of the commissioners. It is urged that a half mile is a very short limit, and that it might well be a mile or two. But the commissioners are probably better judges of this matter than counsel; and if it is thought they have erred in this respect they must be asked to correct it. It is not in the power of the court to disregard or modify their action thereabout.

As to whether the offer of the libelant was made within a half mile of the Ullock, the testimony of the two crews is widely divergent. The reason given by the master of the Ullock for declining the offer is evidently not ingenuous, and ought to have some effect upon his general credibility. He says that he preferred to take a pilot from the schooner, because he knew the charges were less than those of the tug pilots; and at the same time, as a reason for not taking this

cheaper one when it was offered him, he says that he did not want to take a pilot so far from the bar and thereby incur the additional expense of "distance" or "off-shore" pilotage. But he knew very well that there is no such thing as "distance" or "off-shore" pilotage at the mouth of the Columbia river, and that the charge for piloting a vessel in and over the bar is all one, whether the pilot boards her at the outermost buoy or at any distance beyond. He had run his reckoning for the Columbia river, and been unable to take an observation for some days on account of the fog, and would naturally be glad to avail himself of the services of the first pilot that offered, unless there was some special and cogent reason to the contrary. It is certain that the reason assigned was not the true one. And probably the fact is that the master really desired to take a pilot from the tug so as to facilitate a deal for towage, which is a much weightier matter than the cost of pilotage. But I doubt, even on the evidence of the libelant and others of the crew of the schooner, if she was ever within a half mile of the Ullock on that occasion before the pilot of the tug boarded her. The burden of proof in this respect is on the libelant; and he cannot prevail unless it appears from the evidence that his offer was made to the Ullock within the legal distance. The strongest statement which the libelant is willing to make on this point is that he was within from one to three-quarters of a mile of the Ullock; and this being taken as it should be most strongly against himself, amounts to no more than that he was within three-quarters of a mile of said vessel.

But there is another point made in the case by the claimant, upon which, I think, the decision must be against the libelant. By the act of March 2, 1837, (5 St. 153; section 4236, Rev. St.,) it is provided that "the master of any vessel coming in or going out of any port situate upon waters which are the boundary between two states, may employ any pilot duly licensed or authorized by the laws of either of the states bounded on such waters to pilot the vessel to or from such port." This act was passed, as is well known, on account of the conflicting legislation and the strife between New York and New Jersey and their pilots, for the pilotage of vessels entering the Hudson river and bound to New York or other ports thereon. It may be admitted that the Columbia river is not a boundary between two "states" in the sense in which the word is used in the constitution, but it is the boundary between one such state and an organized territory of the United States. The case is within the mischief intended to be remedied by the act of 1837. The subject is wholly within the power of congress, and it may apply the rule contained in the act to the case of a water forming the boundary between a state and territory, as well as between two states of this Union. The territory of Washington is an organized political body,—a state in the general and unqualified sense of the word,—with power to legislate on all rightful subjects of legislation, except as otherwise provided in its constitu-

tion, one of which is pilots and pilotage on the Columbia river bar. *The Panama*, 1 Deady, 31. True, this power is derived for the time being from congress. But the power of a state of the Union to legislate on this subject only exists until congress sees proper to exercise it. There being no constitutional limitation upon the power of congress in this respect, and it having the same right to regulate the taking of a pilot on a water that forms the boundary between a state and territory as it has between two states proper, I think the word "state" in the act of 1837 ought to be construed to include any organized body politic or community within the territorial jurisdiction of the United States, having the power to legislate on the subject of pilots and pilotage on a water forming a boundary between itself and a state of this Union.

In the case of *The Panama, supra,* in speaking of this act in 1861, I said:

"Whether the word 'state' as used in this act should be construed so as to include a territory, is a question not free from doubt. The case is within the *mischief* intended to be remedied by the act, and, it seems to me, might be held to come within its spirit and purview, without any violation of principle. I do not think it comes within the reasoning or considerations that controlled the court in *Hepburn* v. *Ellzey,* 2 Cranch, 445, in which it was held that under the judiciary act, giving the national courts jurisdiction of controversies between citizens of different *states,* that a citizen of the District of Columbia could not sue in such courts as a citizen of a state, because such District was not a member of the Union."

The ruling in *Hepburn* v. *Ellzey, supra,* was afterwards applied in *New Orleans* v. *Winter,* 1 Wheat. 91, to the case of a territory, when it was said that although the district and the territory are both states, —political societies,—in the larger and primary sense of the word, neither of them is such in the sense in which the term is used in the constitution, in the grant of judicial power to the national government on account of the citizenship or residence of the parties to a controversy, when it is understood to comprehend only "members of the American confederacy." In *Barney* v. *Baltimore,* 6 Wall. 287, these rulings were followed without question, upon the principle of *stare decisis.*

In *Watson* v. *Brooks,* 8 Sawy, 321, [S. C. 13 FED. REP. 540,] it was said even of this construction:

"It is very doubtful if this ruling would now be made if the question was one of first impression; and it is to be hoped it may yet be reviewed and overthrown. By it, and upon a narrow and technical construction of the word 'state,' unsupported by any argument worthy of the able and distinguished judge who announced the opinion of the court, the large and growing population of American citizens resident in the District of Columbia and the eight territories of the United States are deprived of privileges accorded to all other American citizens, as well as aliens, of going into the national courts when obliged to assert or defend their legal rights away from home."

But the special reason for this narrow construction of the word "state" does not apply in this case. Congress had the power to ex-

tend the act of 1837 over a water constituting the boundary between the state of Oregon and the territory of Washington. The language actually used in the act may reasonably be construed so as to accomplish this object; and the case is within the mischief intended to be remedied thereby. The master of the Ullock being then entitled, upon this construction of the law, to take a pilot from either Oregon or Washington, without reference to which made the first offer of his services, the libelant is not entitled to recover as for an offer and refusal of pilot services, even though such offer was duly made.

There must be a decree dismissing the libel, and for costs to the claimant.